CHOI & ITO
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Telefacsimile: (808) 566-6900
E-Mail:  cchoi@hibklaw.com; aito@hibklaw.com

Attorneys for Debtors
and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PACIFIC LINKS U.S. HOLDINGS, INC.,<br><br>         Debtor and Debtor-in-Possession. | Bk. No. 21-00094<br>(Chapter 11)<br>(Jointly Administered)<br><br>DISCLOSURE STATEMENT DATED JUNE 25, 2021 FOR FIRST JOINT CHAPTER 11 PLAN; EXHIBITS A-C |
| This document relates to<br>ALL CASES | Confirmation Hearing:<br>Date: _____, 2021<br>Time: 2:00 p.m.<br>Judge: The Hon. Robert J. Faris |

83586

## DISCLAIMERS

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE FIRST PROPOSED JOINT CHAPTER 11 PLAN OF PACIFIC LINKS U.S. HOLDINGS, INC., HAWAII MVCC, LLC, HAWAII MGCW, LLC, MDRE LLC, MDRE 2 LLC, MDRE 3 LLC, MDRE 4 LLC, AND MDRE 5 LLC WHICH THESE JOINTLY ADMINISTERED DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS.

ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

83586

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTOR HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE PLAN PROPONENT OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF OR CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS

U.S. Bankruptcy Court - Hawaii   #21-00094   Dkt # 203   Filed  06/25/21   Page 3 of 62

**DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE PERFORMANCE. SUCH FORWARD-LOOKING STATEMENTS REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' RESTRUCTURING PLANS OR CAUSE THE ACTUAL RESULTS OF THE DEBTORS TO BE MATERIALLY DIFFERENT FROM THE HISTORICAL RESULTS OR FROM ANY FUTURE RESULTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. THERE CAN BE NO ASSURANCE THAT THE TRANSACTION DESCRIBED HEREIN WILL BE CONSUMMATED. CREDITORS AND OTHER INTERESTED PARTIES SHOULD SEE THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE FUTURE FINANCIAL PERFORMANCE OF THE DEBTORS.**

U.S. Bankruptcy Court - Hawaii   #21-00094   Dkt # 203   Filed  06/25/21   Page 4 of 62

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1
        A.      PURPOSE OF DISCLOSURE STATEMENT...................................4
        B.      IMPORTANT NOTICE AND CAUTIONARY STATEMENT.........5
        C.      HOLDERS OF CLAIMS ENTITLED TO VOTE...............................7
        D.      VOTING PROCEDURES........................................................................8
II.     BACKGROUND INFORMATION ......................................................9
        A.      HISTORY OF COMPANY AND ACQUISITIONS............................9
        B.      DIVESTITURES AND ATTEMPTED DEVELOPMENT AND
        SALE 12
        C.      CDH DEBT AND FORECLOSURE ACTIONS ...............................14
        D.      CHINESE INVESTORS .....................................................................16
        E.      FINANCIAL CONDITION ON PETITION DATE AND CLAIMS.16
        F.      POST-PETITION DEVELOPMENTS...............................................17
        G.      POTENTIAL AVOIDANCE CLAIMS OF THE ESTATES.............21
        H.      POST-CONFIRMATION PAYMENT OF U.S. TRUSTEE'S
        QUARTERLY FEES/ POST-CONFIRMATION REPORTS......................22
III.    SUMMARY OF THE PLAN ...............................................................22
        A.      CLASSIFICATION AND TREATMENT OF CLAIMS AND
        EQUITY INTERESTS ..................................................................................22
        B.      SUMMARY OF OTHER PROVISIONS OF THE PLAN.................31
IV.     VOTING A1ND CONFIRMATION OF THE PLAN ..................................37
        A.      GENERAL ........................................................................................37
        B.      VOTING PROCEDURES AND REQUIREMENTS........................39
        C.      CONFIRMATION HEARING ...........................................................40
        D.      MODIFICATION OR WITHDRAWAL OF THE PLAN. ...............40
        E.      ACCEPTANCE OR CRAMDOWN...................................................42
        F.      BEST INTERESTS TEST; LIQUIDATION ANALYSIS ................42
        G.      FEASIBILITY...................................................................................45
        H.      COMPLIANCE WITH APPLICABLE PROVISIONS OF THE
        BANKRUPTCY CODE .................................................................................46
        I.      RETENTION OF JURISDICTION .................................................46
V.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
        CONSUMMATION OF THE PLAN ........................................................46
        A.      CONSEQUENCES TO THE DEBTOR ...........................................48
        B.      CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS..........49
        C.      BANKRUPTCY CODE EXEMPTIONS FROM REGISTRATION
        REQUIREMENTS .......................................................................................50

83586

VI.	RECOMMENDATION AND CONCLUSION ............................................51

U.S. Bankruptcy Court - Hawaii   #21-00094   Dkt # 203   Filed  06/25/21   Page 6 of 62

# I.   <u>INTRODUCTION</u>

PACIFIC LINKS U.S. HOLDINGS, INC. a Delaware Corporation ("PLUSH"), HAWAII MVCC LLC, a Hawaii limited liability Company ("MVCC") HAWAII MGCW LLC, a Hawaii limited liability Company ("MGCW"), MDRE LLC, a Hawaii limited liability Company ("MDRE"), MDRE 2 LLC, a Hawaii limited liability Company ("MDRE 2"), MDRE 3 LLC, a Hawaii limited liability Company ("MDRE 3"), MDRE 4 LLC, a Hawaii limited liability Company ("MDRE 4") and MDRE 5 LLC, a Hawaii limited liability Company ("MDRE 5") (collectively, "Plan Proponents" or "Debtors") have filed a Joint Chapter 11 Plan, a copy of which is attached hereto as <u>Exhibit "A</u>."  Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.  The Plan Proponents recommend that you review the definitions section of the Plan before proceeding to review this Disclosure Statement.

This Disclosure Statement is being sent to you to help enable you to make an informed judgment about the Plan, and to solicit your acceptance of the Plan.

SPECIAL NOTE TO CHINESE PARTIES:  Chinese parties may wish to obtain a Chinese translation of this Disclosure Statement and the Plan.

[INSERT CHINESE TRANSLATION OF ABOVE "SPECIAL NOTE" HERE].

83586

For purposes of voting, Confirmation, and distributions under the Plan, the Chapter 11 Cases shall be deemed to be one consolidated case as of the Effective Date. All property of each of the Debtors' Estates shall be deemed to be property of a consolidated Entity consisting of all of the Debtors' Estates. Each Claim against any of the Debtors will be deemed to be a Claim against a consolidated Entity consisting of all of the Debtors, and any proof of Claim Filed against one or more of the Debtors will be deemed to have been Filed against the consolidated Entity. All guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a creditor will be deemed to be a single obligation. Any and all Claims among or between Debtor entities shall be waived and not entitled to any distribution under the Plan.

The limited substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against collateral that cease to exist by virtue of substantive consolidation. Substantive consolidation shall not (a) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation; (b) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation; (c) affect each Debtors'

2

separate corporate existence or independent ownership of property for any purposes other than for the limited purpose of making distributions under the Plan; or (d) affect any Causes of Action of each of the Debtors.

The Plan Proponents believe that the Plan provides the greatest and earliest possible recovery to Holders of Allowed Claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative would result in further delay, uncertainty, expense, and, smaller distributions to Holders of Allowed Claims. The Plan Proponents believe the acceptance, confirmation and implementation of the Plan is in the best interests of creditors of the Debtor.

The United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court") has scheduled a hearing on _____, 2021, at 2:00 p.m. to consider whether to confirm the Plan.

After notice and a hearing held on _____, 2021, the Bankruptcy Court signed an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.

The Disclosure Statement order sets forth deadlines for voting to accept or reject the Plan and procedures to be followed to object to confirmation of the Plan. A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure

U.S. Bankruptcy Court - Hawaii   #21-00094   Dkt # 203   Filed  06/25/21   Page 9 of 62

Statement that is submitted to the Holders of Claims whom are entitled to vote to accept or reject the Plan. In addition, voting instructions accompany each ballot.

Each Holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the notice of Confirmation Hearing and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A)
- Debtors' Organization Chart (Exhibit B)
- Liquidation Analysis (Exhibit C)

If you have not received all of the enclosures, please contact Debtors' counsel, Choi & Ito, Attorneys at Law, at (808) 533-1877, or email aito@hibklaw.com.

A.  PURPOSE OF DISCLOSURE STATEMENT

The Bankruptcy Code requires that a proponent of a chapter 11 plan file with the Bankruptcy Court a "disclosure statement" that provides information of a kind, and in sufficient detail, that would enable a typical holder of claims or equity interests in a class Impaired under that plan to make an informed judgment with

respect to the plan.  This Disclosure Statement provides such information, as well as information regarding the deadlines for casting ballots with respect to the Plan, the deadlines for objecting to confirmation of the Plan, the requirements that must be satisfied in order for the Bankruptcy Court to confirm the Plan, and other relevant information.  Parties in interest should read this Disclosure Statement, the Plan, and all of the accompanying exhibits in their entirety in order to determine:

- How the Plan will affect their Claims against any Equity Interests in the Debtors;

- Their rights with respect to voting for or against the Plan;

- Their rights with respect to objecting to confirmation of the Plan; and

- How and when to cast a ballot with respect to the Plan.

The Disclosure Statement, however, cannot and does not provide Holders of Claims and Equity Interests with legal or other advice.  You should consult with your lawyers and/or financial advisors to obtain specific advice regarding how the Plan will affect you and regarding your best course of action with respect to the Plan.

B.    IMPORTANT NOTICE AND CAUTIONARY STATEMENT

The historical financial data relied upon in preparing the Plan and this Disclosure Statement are based upon the Debtors' books and records.  The liquidation analysis, estimates, and other financial information referenced in this Disclosure Statement or attached hereto as exhibits have been developed by the

Debtors and their professional advisors. Although these professional advisors assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Debtors and third parties, most of which information has not been audited. These professional advisors have not independently verified such information and, accordingly, make no representations as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, neither the Debtors nor Committee can warrant or represent that the information in this Disclosure Statement, including any and all financial information, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

No Person may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the Plan Proponents or any other Person, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on Holders of Claims or Equity Interests in the Bankruptcy Case.

6

### C.  HOLDERS OF CLAIMS ENTITLED TO VOTE

Holders of Claims in Classes 3 through 8 (collectively the "Voting Classes") are entitled to vote on the Plan because such Classes are: (i) Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code; and (ii) may receive distributions of property under the Plan and therefore are not deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

Each Holder of an Allowed Claim in Classes 1 and 2 are deemed to have accepted the Plan because Holders of Allowed Claims in these Classes are Unimpaired.  Each Holder of an Allowed Equity Interest in Class 9 is deemed to reject the Plan because holders of an Allowed Equity Interests in Class 9 will receive no distribution under the Plan.

The Bankruptcy Court may confirm the Plan only if at least one Class of Impaired Claims has voted to accept the Plan (without counting the votes of any insiders whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to dissenting Classes.  A Class of Claims has accepted the Plan only when at least one-half in number and at least two-thirds in amount of the Claims actually voting in that Class, excluding votes by Insiders, vote in favor of the Plan.

In the event of a rejection of the Plan by one or more Voting Classes, the Plan Proponents intend to request that the Bankruptcy Court confirm the Plan in

accordance with section 1129(b) of the Bankruptcy Code, which permits confirmation notwithstanding such rejection if the Bankruptcy Court finds that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Classes.

D.    VOTING PROCEDURES

      1.    **Voting Procedures and Deadlines**

The Debtor has provided copies of this Disclosure Statement and ballots (which include detailed voting instructions) to all known Holders of Impaired Claims in the Voting Classes. Those Holders of a Claim in a Voting Class who seek to vote to accept or reject the Plan must complete the enclosed ballot and return it to:

> Choi & Ito
> Attorneys At Law
> 700 Bishop Street, Suite 1107
> Honolulu, Hawaii 96813
> Telephone: (808) 533-1877
> Attn: Allison A. Ito, Esq.
> e-mail: aito@hibklaw.com

so that it actually is received by no later than the Balloting Deadline (as defined below). Creditors are encouraged to read and review their ballots carefully.

**All ballots must be completed, signed, returned to, and actually received by Choi & Ito by no later than _____, 2021, at 4:00 p.m., Hawaiian Standard Time (the "Balloting Deadline").** Ballots received after the Balloting

Deadline, and ballots returned directly to the Bankruptcy Court, will not be counted in connection with confirmation of the Plan.

### 2. Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____, 2021, at 2:00 p.m. in the Courtroom of the Honorable Robert J. Faris, United States Bankruptcy Judge for the District of Hawaii. The Confirmation Hearing may be continued from time to time by announcement in open court without further notice.

Any objections to confirmation of the Plan must be Filed with the Bankruptcy Court and served no later than _____, 2021: Objections that are not timely Filed and served may not be considered by the Bankruptcy Court. Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.

## II. BACKGROUND INFORMATION

### A. HISTORY OF COMPANY AND ACQUISITIONS

The "Pacific Links" group of companies was started by Sha Du, a Canadian national in about 2010. Member companies in the network acquired golf courses in North America, Hawaii, and in Asia and entered into reciprocity agreements with internationally renowned golf courses. The member entities sold memberships in Asia to golf aficionados.

9

Mr. Du owns (a) the sole parent of PLUSH; (b) the sole parent of Pacific U.S. Services Inc., a Delaware corporation ("PLUS Services")[1]; and (c) Pacific Links (Asia) Holding Co., Ltd., a Hong Kong corporation which owns a controlling interest in Tianjin Kapolei Business Information Consultancy Co., Ltd. ("Chinese Affiliate") which borrowed 400 million RMB from Tianjin Dinhui Hongjun Equity Investment Partnership ("CDH") in 2017.

Attached hereto as **Exhibit B** is an organization chart for the Debtors and their affiliates as of the Petition Date.

Between 2011 and 2015, the Debtors acquired the approximately 644-acres of entitled, master-planned development property commonly referred to as the "Makaha Valley Resort" in the Makaha valley on Oahu for a total acquisition cost of approximately $35 million. The acquisitions are summarized below:

- In 2011, Hawaiian Golf Properties LLC (aka HGP LLC) acquired the Makaha West Golf Course and the 2.69-acre resort parcel from Northwynd Resort Properties Ltd. for approximately $7.988 million.

- In 2014, Hawaiian Golf Properties transferred title to the Makaha West Golf Course and the resort parcel to MGCW. This 2.69 acre resort parcel was formerly the site of the Sheraton Makaha Resort, which was closed in 2011 and demolished in 2014.

- In 2012, MVCC acquired the Makaha East Golf Course for approximately $6.5 million.

---

[1] PLUS Services was created in 2012, to provide centralized administrative support to the PLUSH subsidiaries and managed the U.S. golf operations.

- In early 2014, MDRE LLC acquired approximately 23-acres of resort-zoned property through a combination of a voluntary conveyance and foreclosure.

- In November 4, 2014, MDRE 2 LLC entered into a Purchase and Sale Agreement with MRGC LLC and Kehalani Commercial Associates LLC (together, "Towne") to purchase approximately 44.184 acres of resort-zoned property from Towne for $6.5 million plus "Additional Consideration." MDRE 3 and MDRE 4 executed two Promissory Notes in the original principal amounts of $5.0 million and $3.78 million, respectively, in favor of Towne. MDRE 3 and MDRE 4 are jointly and severally liable on the notes which require substantial annual payments to Towne and contain default interest at 12% per annum. MDRE 3 and MDRE 4 also executed the Towne Mortgage securing their obligations under the Towne notes.

- In 2015, MDRE 2 acquired the approximately 66.9 acres of residential property from Ko Olina Makaha East LLC, and Ko Olina Makaha East II LLC and MDRE 5 acquired approximately 15.01 acres of real property to be used for roadways and other infrastructure.

A summary of the Debtors' real estate assets are as follows:

| Owner | Parcel Number (TMK) | Acreage | Zoning |
|-------|---------------------|---------|--------|
| MGCW | 1-8-4-002-074 | 2.69 | Resort |
| MGCW | 1-8-4-002-055 | 87.44 | Preservation |
| MGCW | 1-8-4-002-053 | 167.09 | Preservation |
| MGCW | 1-8-4-002-067 | 0.76 | Preservation |
| MVCC | 1-8-4-002-005 | 145.4 | Preservation |
| MVCC | 1-8-4-002-056 | 44.51 | Preservation |
| MVCC | 1-8-4-002-057 | 40.26 | Preservation |
| MVCC | 1-8-4-002-076 | 0.45 | Preservation |
| MVCC | 1-8-4-023-014 | 1 | Preservation |
| MVCC | 1-8-4-023-015 | 1.44 | Preservation |
| MVCC | 1-8-4-024-001 | 2.93 | Preservation |
| MDRE | 1-8-4-002-075 | 4.29 | Resort |
| MDRE | 1-8-4-002-051 | 19.43 | Resort |
| MDRE 2 | 1-8-4-002-007 | 66.9 | Residential (R-20) |
| MDRE 3 | 1-8-4-002-052 | 8.48 | Resort |
| MDRE 4 | 1-8-4-002-054 | 32.78 | Resort |

11

| Owner | Parcel Number (TMK) | Acreage | Zoning |
|-------|---------------------|---------|--------|
| MDRE 4 | 1-8-4-002-077 | 2.93 | Resort |
| MDRE 5 | 1-8-4-002-012 | 6.91 | Agricultural |
| MDRE 5 | 1-8-4-002-070 | 2.9 | Residential |
| MDRE 5 | 1-8-4-020-015 | 2.78 | Residential |
| MDRE 5 | 1-8-4-019-032 | 2.41 | Residential |
| MDRE 5 | 1-8-4-021-068 | 0.01 | Residential |

B.      DIVESTITURES AND ATTEMPTED DEVELOPMENT AND SALE

By 2014, PLUSH owned five golf courses in Hawaii (Kapolei Golf Club, Olomana Golf Club, the Royal Hawaiian Golf Club, Makaha West Course, and the Makaha East Course) and five golf courses located on the U.S. Mainland (in California, Nevada and West Virginia).

Unfortunately, between 2010 and 2015, golf course maintenance and operating costs in the United States skyrocketed to the point that golf course ownership was unsustainable. After operating at a seven-digit loss for several years, PLUSH in 2015 began to divest ownership of its golf courses (excluding the Makaha courses) and sold off three courses in Hawaii and five courses on the mainland to unaffiliated buyers.

Notwithstanding these divestitures, the Debtors continued with plans to develop the Makaha Property and worked with developer Stanford Carr to plan a three-phase development: Phase I: golf villa units, and residential units; Phase II: Hotel and Timeshare Units, and Phase III: Residential Units, Retail, Health &

Wellness and Arts Center. Upon completion, the development would include two (redesigned) golf courses, up to approximately 250 hotel units, approximately 318 timeshare units, 110 residential units, and approximately 88 golf villa units.

MDRE served as the primary "developer" for the Makaha Property. In 2016, MDRE entered into agreements with various consultants for the development of a hotel and the redesign of the two golf courses. PLUS Services contracted with Tiger Woods Design, Inc. and Gil Hanse to design the two golf courses. Also, PLUS Services entered into an employment agreement (effective as of January 1, 2016) with Rudolph Anderson whereby Mr. Anderson became President of Pacific Links International.

The development of Phase I for the Makaha Project did not occur as anticipated notwithstanding the expenditure of approximately $15 million from 2015 to 2019 towards the redevelopment of the Makaha Property, including costs for demolition of the existing hotel, road and sewer work, master design of the project, and addressing zoning matters. The Makaha Valley Resort project's book value was approximately $47.4 million as of December 31, 2019.

By 2019, the annual shortfall for the Makaha Property development was between $5-7 million. Unable to address the shortfall or otherwise finance the continued operations and development of the Makaha Property, the Debtors decided to list the Makaha Property for sale. In October 2019, CBRE listed l the

Makaha Property for sale at a $35 million listing price. By the spring of 2020, CBRE had received strong expressions of interest for the Makaha Property. However, the COVID pandemic and related restrictions effectively put an end to marketing efforts until after the Petition Date.

C.    CDH DEBT AND FORECLOSURE ACTIONS

In 2017, Tianjin Kapolei Business Information Consultancy Co., Ltd. ("Chinese Affiliate") borrowed approximately 400 million RMB (the "CDH Convertible Debt") from CDH which was approximate $59.1 million at the exchange rate then in effect. As of December, 2019, the CDH Convertible Debt was approximately $61 million at the applicable exchange rate.

In December, 2019, CDH conditioned an extension of the maturity date of the CDH Convertible Debt on, among other things, the execution by the Debtors of the Secured Guaranty  whereby the Debtors guaranteed the obligations of the Chinese Affiliate to CDH, and upon the execution of the CDH Mortgages which encumbered most of the Makaha Property to secure the obligations under the Secured Guaranty.[2]  However, as set forth in the Complaint filed against CDH in the Bankruptcy Court, the Debtors maintain they did not receive any benefit from the CDH loan made in 2017. .

_____

[2] CDH did not record a mortgage against the MDRE 3 Real Property, and Parcel 54 of the MDRE 4 Real Property.

In March, 2020, Towne commenced a foreclosure action against MDRE 3 and MDRE 4 in the Circuit Court for the First Circuit Court of the State of Hawaii (the "First Circuit Court"). At a hearing held on October 7, 2020, the First Circuit Court granted summary judgment in favor of Towne and appointed a foreclosure commissioner.

In May 2020, Rudy Anderson was let go due to the low cash position of the companies and in light of uncertainty brought on by the COVID pandemic.

On January 22, 2021, CDH commenced a foreclosure action against MVCC, MGCW, MDRE, MDRE 2, MDRE 4, and MDRE 5 in the First Circuit Court. Around the same time that CDH filed its foreclosure complaint, CDH also commenced an arbitration proceeding in China in which CDH sought to liquidate the five golf courses owned by the Chinese Affiliate. The Debtors are informed that the book value for the assets in China is approximately 1.8 billion RMB (or roughly U.S. $205 million). The arbitration proceeding pending in China between the Chinese Affiliate, other parties and CDH is currently in the "discovery" phase.

Due to continuing liquidity issues, the COVID pandemic, and pressure put on the Debtors by the foreclosure actions, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Hawaii on February 1, 2021.

D.    CHINESE INVESTORS

Beginning in 2018, approximately 25 Chinese Investors paid a total of approximately 36 million RMB to enter into Membership Subscriptions for Pacific Links Makaha Golf Resort to: (a) acquire memberships in the Pacific Links Makaha Golf Resort and (b) purchase certain parcels in the Makaha Property. Most of these creditors have filed Claims in the Chapter 11 Cases but certain creditors may not have received notice of the deadline to file claims.

E.    FINANCIAL CONDITION ON PETITION DATE AND CLAIMS

On February 17, 2021, each of the Debtors filed a *Schedules and Statement of Financial Affairs,* which sets forth each Debtor's creditors and financial condition as of the Petition Date.

The Debtors' Schedules filed herein showed the following Assets and Liabilities as of the Petition Date:

| DEBTOR | ASSETS (Real Estate) [3] | ASSETS (Non-Real Estate) | LIABILITIES [4] |
|---|---|---|---|
| PLUSH | | $37,000.00 | $107,542,985.03 |
| MVCC | $9,140,600.00 | $66,410.22 | $96,302,106.96 |
| MGCW | $9,230,500.00 | $2,186.08 | $96,097,512.38 |
| MDRE | $5,015,200.00 | $11,097.25 | $96,665,241.10 |
| MDRE 2 | $4,525,900.00 | | $96,024,660.92 |
| MDRE 3 | $2,629,300.00 | | $102,077,878.21 |
| MDRE 4 | $5,896,300 | | $102,143,233.92 |

---

[3]   Based on tax assessed values.
[4]   The debt to Towne in the amount of $6,610,789.45 is carried on the schedules of MDRE 3 and MDRE 4.

| MDRE 5 | $500.00 | | $95,962,378.00 |
|--------|---------|--|----------------|

The <u>disputed</u> debt to CDH in the amount of $95,962,378.00 is listed on the schedules on each of the Debtors.

The deadline for creditors to file prepetition claims against the Debtors was June 11, 2021. Approximately $5.96 million in general unsecured claims were filed against the various Debtors summarized as follows: $1.28 million by Rudolph Anderson against PLUSH, $3.85 million by 13 Chinese Investors, $920,000.00 by various trade creditors (including a $500,000.00 by Tiger Woods). CDH also filed substantially identical claims against each of the Debtors in the amount of $102,103,995.00.

F.    <u>POST-PETITION DEVELOPMENTS</u>

    **1.    Motion for Joint Administration and DIP Financing Motion**

On the Petition Date, the Debtors filed an Ex Parte Motion for Order Directing Joint Administration of the Debtors' Cases. On February 2, 2021, the Bankruptcy Court entered an Ex Parte Motion for Order Directing Joint Administration of the Debtors' Cases.

On February 3, 2021, MVCC (owner of the Makaha East Golf Course) filed several "first day" motions, including its Motion for Order Authorizing Debtor to Use Cash Collateral Pursuant to Section 363(c)(2) (the "Cash Collateral Motion"),

seeking to use the proceeds of the golf course operations to pay ordinary operating expenses.

On February 8, 2021, the Debtors filed a Motion for Order Authorizing Debtor to Obtain Postpetition Secured Indebtedness ("DIP Financing Motion") in which the Debtors sought authority to borrow up to $250,000 from Wei Zhou protected by a super-priority status and a junior lien on the Makaha Property. The DIP Loan was intended to primarily fund professional fees and expenses.

At an interim hearing held on February 3, 2021, the Bankruptcy Court authorized MVCC to use cash collateral pending a final hearing on the DIP Financing and Cash Collateral Motion which was scheduled for February 20, 2021 but continued to March 8, 2021, at CDH's request.

On March 8, 2021, the Bankruptcy Court held a further hearing on the Cash Collateral and the DIP Financing Motions. The Bankruptcy Court granted the DIP Financing Motion but only on an unsecured administrative priority basis (with certain other clarifications) and continued the hearing on the Cash Collateral Motion to May 24, 2021 and again to May 28, 2021. At a hearing on May 28, 2021, the Bankruptcy Court approved the Cash Collateral Motion on a final basis.

As of May 31, 2021, the Debtors have drawn $50,000 of the available $250,000.00 DIP Loan, but in June, 2021, the Bankruptcy Court approved the fees

and expenses of bankruptcy and litigation counsel for the Debtors in the combined amount of $119,547.54 which will be paid from the DIP Loan.

### 2. Employment of Professionals

The Debtors have retained Choi & Ito as bankruptcy counsel, and Tsugawa Lau & Muzzi, as special litigation counsel.

### 3. Single Asset Real Estate Motion by CDH and Towne's Motion for Relief from Stay

On March 29, 2021, Towne filed a motion to relief from stay to proceed with pending foreclosure action and for adequate protection. MDRE 3 and MDRE 4 opposed Towne's motion on the basis that there is an adequate equity cushion to protect Towne's interest. A continued hearing is set for July 13, 2021.

On April 6, 2021, CDH filed a motion for determination under 11 U.S.C. §362(d)(3) of Single Asset Real Estate Status of Hawaii MGCW, LLC, MDRE LLC, MDRE 2 LLC, MDRE 3 LLC, MDRE 4 LLC, and MDRE 5 LLC (the "SARE Motion"). The Debtors opposed the SARE Motion which was joined by Towne.

The Bankruptcy Court determined that each of Hawaii MGCW, LLC, MDRE LLC, MDRE 2 LLC, MDRE 3 LLC, MDRE 4 LLC, and MDRE 5 LLC constitute single asset real estate ("SARE") cases as defined by the Bankruptcy Code.

### 4.  CDH Lawsuit

On March 4, 2021, the Debtors filed a complaint to avoid fraudulent transfers and fraudulent obligations (the "Complaint") against CDH commencing adversary proceeding no. 21-90009 (the "CDH Lawsuit").  In the CDH Lawsuit, the Debtors seek to set aside, as fraudulent transfers or fraudulent obligations, various loan documents and instruments executed by the Debtors in December, 2019 in connection with the CDH Convertible Debt Agreement.

On April 23, 2021, CDH filed a motion to dismiss the Complaint (the "Dismissal Motion") arguing that the CDH Lawsuit should be resolved in China because relevant conduct occurred in China, the presumption against extraterritorial application of fraudulent transfer law has not been rebutted, and because Chinese law is the applicable law.  On June 7, 2021, the Bankruptcy Court denied the Dismissal Motion.  The Bankruptcy Court stated that while the Framework Agreement may have been signed in China (and written in Chinese), there are aspects of the transactions tied to the US legal system.  The Court also stated that the subject mortgages and the pledge agreement each contained a provision that the parties submit to jurisdiction in Hawaii, and that the collateral is located in the United States.

Trial in the CDH Lawsuit is set for the week of June 27, 2022.

### 5. Debtors' Financial Condition

MVCC, the owner and operator of the Makaha East Course, is the only Debtor with any operations. MVCC's gross revenues have trended downward since 2017. Gross revenues for 2017, were approximately $1.083 million. Gross revenues for 2018 were approximately $1.062 million. Gross revenues for 2019 were approximately $1.092 million. Gross revenues for 2020 were approximately $892,160. Gross revenues were approximately $101,415.00 from January 1, 2021 to the Petition Date.

Between February and May 2021, MVCC generated approximately $370,000 in gross revenues (or a monthly average of approximately $90,000). Two factors have contributed to the MVCC growth in revenues since the Petition Date: (1) an increase in demand for tee times during the COVID Pandemic; and (2) cost adjustments to the day-to-day operations.

As of June 1, 2021, MVCC was holding cash of approximately $84,379.

### G. POTENTIAL AVOIDANCE CLAIMS OF THE ESTATES

During the 90 days before the Petition Date, MVCC made certain additional payments to vendors in order to obtain additional supplies and raw materials. These payments are not significant and are estimated to total less than $96,500 in order to pay for taxes, and purchase insurance, utilities, and additional services / supplies to operate the golf course. Under the Plan, any claims of these Estates

arising under or pursuant to Chapter 5 of Chapter 11 of the Bankruptcy Code shall

be deemed extinguished on the Effective Date of the Plan. The Debtors are not

aware of any transfers pre-petition to or for the benefit of insiders.

H.   POST-CONFIRMATION PAYMENT OF U.S. TRUSTEE'S QUARTERLY FEES/ POST-CONFIRMATION REPORTS

The Debtors shall pay any and all accrued post-petition U.S. Trustee's

quarterly fees, including any such fees that accrue up to the Effective Date. The

Debtors shall pay post-confirmation quarterly fees until the Chapter 11 Case is

closed by the Court, dismissed, or converted to another chapter under the

Bankruptcy Code. The Debtors will file post-confirmation status reports required

by the U.S. Trustee Guidelines in the proper form.

## III.   SUMMARY OF THE PLAN

The discussion of the Plan set forth below is qualified in its entirety by reference

to the Plan, the terms of which are controlling. Holders of Claims and Interests and

other interested parties are urged to read the Plan in its entirety so that they may

make an informed judgment concerning the Plan.

A.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The Plan provides for the treatment of eight (8) Classes of Claims and one

(1) Class of Equity Interests. The treatment of Claims described below applies

only to Allowed Claims and Equity Interests. Claims that are the subject of a

pending objection before the Bankruptcy Court or other pending litigation, or that have not been allowed pursuant to a Final Order of the Bankruptcy Court, will receive distributions under the Plan only if and after they become Allowed Claims.

### 1.      Administrative Expenses (Unclassified Claim)

The Plan provides that the Debtors shall pay to each Holder of an Allowed Administrative Expense Claim an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or on such different terms as may be acceptable to the holder of the Allowed Administrative Expense Claim.  The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Administrative Expenses which are Ordinary Course Administrative Expenses. The Confirmation Order shall also contain a deadline for the Debtors to object to Administrative Expense Claims, including Ordinary Course Administrative Expenses.

### 2.      Payment of Priority Tax Claims.

Unless the Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, or such Holder has been paid prior to the Effective Date, the Holder of an Allowed Priority Tax Claim shall receive Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code from the Debtors, provided,

23

however, that Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be a Priority Tax Claim. Any such Claim or demand for any such penalty shall be subordinated to all Classes. On the Effective Date, ay Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated and extinguished, without further Order of the Bankruptcy Court.

The Debtors believes that the State of Hawaii, Department of Taxation holds a valid Priority Tax Claim in the approximate amount of $4,778.90 against MVCC. The State has alleged that there are unfiled tax returns for certain prepetition periods. The Internal Revenue Service has also asserted a Priority Tax Claim in the amount of $134,211.89 and $65,213.33 (against MVCC and MGCW, respectively) for estimated FICA and FUTA. However, the Debtors believe that these amounts have already been paid to the IRS.

### 3. Class 1 – Other Priority Claims

The Plan classifies all Other Priority Claims in Class 1.

Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Claim in Class 1, each such Holder shall receive on the Effective Date or as soon as reasonably practicable thereafter, to the extent not already paid by the Debtors prior to the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim.

24

Class 1 is Unimpaired and the Holders of Claims in Class 1 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### 4.    Class 2 – Towne Secured Claim

The Plan classifies the allowed Towne Secured Claim in Class 2.  Towne is the Holder of the Towne Note, which is secured by (a) the Towne Mortgage which is a first mortgage lien on the MDRE 3 Real Property and the MDRE 4 Real Property, and (b) the Towne UCC which is a first lien on the personal property of MDRE 3 and MDRE 4, as identified therein.  MDRE 3 and MDRE 4 are jointly and severally liable under the Towne Note.  On March 9, 2021, Towne filed proofs of claim against MDRE 3 and MDRE 4, which asserts a secured claim in the amount of $6,601,789.45 as of the Petition Date.  *See* POC #6, 7 in 21-00094. This claim is undisputed.

Treatment: Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment of its Allowed Claim, the Holder shall receive, at its election, and on the earlier of the Outside Closing Date or the Effective Date or as soon thereafter as reasonably practicable, the Towne Collateral, free and clear of all Claims, Liens, charges, or other encumbrances and Interests, or such other treatment rendering its Allowed Class 2 Claim Unimpaired.

Class 2 is unimpaired and Towne is not entitled to vote to accept or reject the Plan.

### 5. Class 3 – CDH Secured Claim

Class 3 consists of the CDH Secured Claim. CDH filed POC Nos. 13-20 which asserts a secured claim in the amount of $102,103,995.00 as of the Petition Date. *See* POC ##13-20 in 21-00094. These claims are disputed. In the CDH Lawsuit, the Debtors are challenging the Framework Agreement, PLUSH is challenging the CDH Membership Interest Pledge Agreement, and the Subsidiary Debtors are challenging the CDH Mortgages. The Debtors intend to sell the Makaha Property and the CDH's liens will attach to the sales proceeds until a final judgment is issued or a Court-approved settlement is reached in the CDH Lawsuit.

Except to the extent that the Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, the Holder of the Allowed Claim in Class 3 shall receive, on the Effective Date or as soon thereafter as reasonably practicable, the Escrowed CDH Sale proceeds, if any, that the Bankruptcy Court determines to be encumbered by the CDH Mortgages, in full satisfaction of the Holder's Allowed Claim.

Class 3 is Impaired, and CDH is entitled to vote to accept or reject the Plan.

### 6. Class 4- DIP Lender Claim

The Plan classifies Class 4 as the Allowed Claim of the DIP Lender. As of May 31, 2021, the Debtors have drawn $50,000 of the available $250,000.00 DIP Loan, but in June, 2021, the Bankruptcy Court approved the fees and expenses of

26

bankruptcy and litigation counsel for the Debtors in the combined amount of $119,547.54 which will be paid from the DIP Loan.

To the extent there are Available Sale Proceeds, the Holder of the Allowed Class 4 Claim shall receive, on the Effective Date or as soon thereafter as reasonably practicable, payment in Cash of such Holder's Allowed Class 4 Claim, provided, however, that if there are no Available Sale proceeds, the Holder of the Allowed Class 4 Claim shall receive no distributions under the Plan.

Class 4 is Impaired, and DIP Lender is entitled to vote to accept or reject the Plan.

### 7. Class 5 –Rudolph Anderson General Unsecured Claim

Class 5 consists of General Unsecured Claim of Rudolph Anderson. On April 1, 2021, Rudolph Anderson filed the largest general unsecured claim ($1,280,732.74) against PLUSH. Mr. Anderson's claim is based on a claim for unpaid wages and employment benefits under his employment contract.

Except to the extent that the Holder of an Allowed Claim in Class 5 agrees to a less favorable treatment of its Allowed Claim, the Holder shall receive, on the Effective Date or as soon thereafter as reasonably practicable, and only to the extent of the Available General Unsecured Proceeds, eighty percent (80%) of the Holder's Allowed Claim in full satisfaction of such Claim, provided, however, that if the Available General Unsecured Proceeds are not sufficient to pay the Holders

of Allowed Claims in Classes 5, 6 and 7 in accordance with the Plan, the Holders of Allowed Claims in said Classes shall receive a Pro Rata Share of the Available General Unsecured Proceeds.

Class 5 is Impaired and Holder of the Allowed Claim in Class 5 is entitled to vote to accept or reject the Plan.

### 8.    Class 6 – Chinese Investor Claims

Class 6 consists of the Allowed General Unsecured Claims of the Chinese Investor against PLUSH filed by thirteen Chinese Investors, which in the aggregate is US$3,846,471.40.  The Chinese Investors have asserted damages allegedly arising from their pre-petition Membership Subscriptions for Pacific Links Makaha Golf Resort memberships.

Except to the extent that the Holder of an Allowed Claim in Class 6 agrees to a less favorable treatment of its Allowed Claim, the Holder shall receive, on the Effective Date or as soon thereafter as reasonably practicable, and only to the extent of the Available General Unsecured Proceeds, eighty percent (80%) of the Holder's Allowed Claim in full satisfaction of such Claim, provided, however, that if the Available General Unsecured Proceeds are not sufficient to pay Holders of Allowed Claims in Classes 5, 6 and 7 in accordance with the Plan, the Holders of Allowed Claims in these Classes shall receive a Pro Rata Share of the Available General Unsecured Proceeds.

Class 6 is Impaired and the Holders of Allowed General Unsecured Claims of the Chinese Investors in Class 6 are deemed to reject the Plan.

**9.      Class 7 –General Unsecured Claims (Other than Rudolph Anderson, Chinese Investors and Numbers Corporation)**

Class 7 consists of Allowed General Unsecured Claims (excluding the Claims of the Numbers Corporation, Chinese Investors and Rudolph Anderson). The Debtors have listed collectively approximately $288,000.00 in valid General Unsecured Claims (not contingent, liquidated, undisputed), excluding the Numbers Corporation.  The Debtors also listed approximately $680,000.00 in contingent, unliquidated or disputed General Unsecured Claims (including approximately $180,000 in claims for American Savings Bank for PPP loans which the Debtors expect to receive full forgiveness).  Another approximately $837,000.00 in General Unsecured Claims have been filed (excluding the Chinese Investors' and Rudolph Anderson's Claims),.  The Debtors estimate that there are approximately $1.0 million in Allowed Claims in this Class 7.

Except to the extent that the Holder of an Allowed Claim in Class 7 agrees to a less favorable treatment of its Allowed Claim, the Holder shall receive, on the Effective Date or as soon thereafter as reasonably practicable, and only to the extent of the Available General Unsecured Proceeds, eighty percent (80%) of the Holder's Allowed Claim in full satisfaction of such Claim, provided, however, that if the Available General Unsecured Proceeds are not sufficient to pay Holders of

29

Allowed Claims in Classes 5, 6 and 7 in accordance with the Plan, the Holders of Allowed Claims in these Classes shall receive a Pro Rata Share of the Available General Unsecured Proceeds.

Class 7 is Impaired and Holders of Allowed Claims in Class 7 are entitled to vote to accept or reject the Plan.

### 10. Class 8 –Numbers Corporation

The Plan classifies the General Unsecured Claim of the Numbers Corporation in Debtor as Class 8. In its Schedule F, PLUSH has listed Numbers Corporation as having a valid General Unsecured Claim (not contingent, liquidated, undisputed) in the amount of $11,500,000.00. The Debtors borrowed these funds to acquire the Makaha Property. Numbers Corporation is ultimately owned by Mr. Du.

Except to the extent that the Holder of an Allowed Claim in Class 8 agrees to a less favorable treatment of its Allowed Claim, the Holder of an Allowed Claim in Class 8 shall receive, on the Effective Date or as soon thereafter as reasonably practicable, any Remaining Funds.

Class 8 is Impaired, and the Holder of the Allowed Claim in Class 8 is entitled to vote to accept or reject the Claim.

### 11. Class 9 – Allowed Equity Interests in PLUSH

The Plan classifies the Allowed Equity Interests in Debtor as Class 9.

On the Effective Date, the Allowed Equity Interest in Class 9 shall be extinguished and the Holder of the Allowed Equity Interest shall receive nothing under the Plan.

Class 9 is Impaired, and the Holder of the Allowed Equity Interest in the Debtors is deemed to reject the Plan.

B.  SUMMARY OF OTHER PROVISIONS OF THE PLAN

1.  **Vesting and Transfer of Assets.**

On the Effective Date, pursuant to Section 1141 of the Bankruptcy Code, all property of the Estates, and any property acquired by the Debtors during the Chapter 11 Cases, shall vest in the respective Debtors, free and clear of all Claims, Liens, charges, or other encumbrances and interests except as provided in the Plan and the Confirmation Order.

2.  **Funding by DIP Lender.**

The DIP Lender shall continue to loan such funds to the Debtors as necessary to permit the Debtors to consummate the Sale Transaction and litigate the CDH Lawsuit to conclusion.  If Available Sale Proceeds for the Estates are not sufficient to pay Administrative and Priority Claims in full under the Plan, the DIP Lender shall fund said amounts.

3.  **Sale or Auction of Makaha Property**

The Debtors shall continue to market the Makaha Property for sale and attempt to consummate the Sale Transaction prior to the Outside Closing Date.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order shall, or shall be deemed to amend modify or waive any term of any Sale Order entered by the Bankruptcy Court.

If the Makaha Property is not sold by the Outside Closing Date or such later date as the Bankruptcy Court may order, and provided that the Debtors have prevailed in the CDH Lawsuit or otherwise have reached an agreement with CDH, the Makaha Property shall be auctioned free and clear of all Claims, Liens, charges, or other encumbrances and Interests through CBRE or another real estate firm, on such terms as the Bankruptcy Court may approve. Notwithstanding the foregoing, Towne shall have the right under the Plan to take back the Towne Collateral, free and clear of all Claims, Liens, charges or other encumbrances and Interests as of the Outside Closing Date. If Towne allows the Towne Collateral to be included in the auction, Towne shall be bound to accept the Purchase Price Allocation for the Towne Collateral by the successful bidder. The Auction Process will generally follow the timeline below:

| PROPOSED DATES | EVENT |
|---|---|
| Early July, 2022 | Auctioneer advises interested parties of a virtual auction and time period for additional due diligence through virtual data room. |
| July, 2022 | Published notice of the auction date, time and place including material information such as: (a) property address; (b) TMK numbers; (c) acreage and description; (d) encumbrances and amounts (based on proofs of claim |

| PROPOSED DATES | EVENT |
|---|---|
| | or Schedules); (e) "bid qualifying requirements" (as set forth below); and (f) time and place for the auction. The sale is "AS IS". Winning bidder must pay 10% of the bid with balance paid in cash within 30 days of entry of a Final Order confirming the auction. |
| Late August, 2022 | Deadline to submit bids online. Interested persons must: (i) submit a written bid which includes Purchase Price Allocation; (ii) deliver proof of readily available funds sufficient to complete the purchase and corporate authority (if applicable), (iii) identify of the bidder; (iv) agree to the terms and conditions of the online auction; and (v) submit Twenty-Five Thousand Dollars ($25,000.00) as an initial deposit ("Initial Deposit"). |
| September, 2022 | Auctioneer will notify all bidders as to whether they are considered a "Qualified Bidder." |
| Late September, 2022 | Auction if necessary. If the auctioneer receives only one bid from a Qualified Bidder, then no auction. If the Auctioneer receives two or more Qualified Bids by the deadline, virtual auction will be conducted. At the conclusion of the auction, the auctioneer shall review and consider each of the Qualified Bids and any increased Qualified Bids and shall determine, which of the Qualified Bid(s) or increased Qualified Bid(s) constitutes the highest and best offer and which of the Qualified Bids or increased Qualified Bids constitutes the second highest and best bid, subject to Bankruptcy Court approval. |
| Early October, 2022 | Winning Bidder executes Purchase Agreement for the Makaha Property which Purchase Agreement shall not be binding upon the Debtors until the Bankruptcy Court enters a Final Order approving the sale. |
| Early November, 2022 | Bankruptcy Court approval. |
| November, 2022 | Closing |

### 4. Binding Effect of Confirmation

Pursuant to the Plan, Confirmation will bind the Debtors, all Holders of Claims or Administrative Expense Claims and other parties in interest to the provisions of the Plan whether or not the Claim or Administrative Expense Claim of such Holder is impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense Claim or Equity Interest has accepted the Plan.

### 5. Good Faith

Confirmation of the Plan will constitute a finding that: (a) the Plan has been proposed by the Plan Proponents in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (b) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### 6. Time and Method of Distributions Under the Plan

PLUSH shall serve as the disbursing agent to hold and distribute Cash and such other property as may be distributed pursuant to the Plan, provided however, that the Debtors, in its sole and absolute discretion, may employ another Person, on such terms as may be determined by the Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Plan. Even if the disbursing agent is a person other than PLUSH, nonetheless the disbursing agent shall be an agent of the Debtors and not a separate taxable entity with respect to,

34

for example, the assets held, income received or disbursements or distributions made for the Debtors. Each class of creditor payments will commence as provided in the Plan as soon as practicable after the Effective Date. No Cash payment of less than ten dollars ($10.00) shall be made by the Disbursing Agent to any Holder of a Claim.

### 7. Provisions for Treatment of Disputed Claims

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expense Claims under the Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expense Claims, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense Claim for purposes of voting on the Plan, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

### 8. Retention of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Debtors, to the extent set forth below, and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Rights of Action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Rights of Action unless the Bankruptcy Court orders otherwise. Absent such express waiver or release, the Debtors, or its successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Debtors.

### 9. Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtor(s) to any Person pursuant to the Plan including (a) the conveyance of any real property, and (b) the making of any agreement or instrument in furtherance of, or in connection with, this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

### 10. Exculpation and Limitation of Liabilities.

To the maximum extent permitted by law and as of the Confirmation Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the debtors, including the bidding and sale process for the debtors' assets, including any sale transaction and the auction process, provided, however, that this provision shall not limit the rights of any holder of a claim or equity interest to enforce rights arising under the plan, further provided, however, that the foregoing exculpation shall have no effect on the liability of any entity to the extent resulting from any act or omission that is determined in a final order to have constituted gross negligence or willful misconduct.

## IV. VOTING A1ND CONFIRMATION OF THE PLAN

### A. GENERAL

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Plan Proponents, including that:

- the Plan has classified Claims and Equity Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Plan Proponents have complied and will comply with the applicable provisions of the Bankruptcy Code;

- the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code (see Section IV.E. "Acceptance or Cramdown");

- the Plan is feasible, including that confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor;

- the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class who do not accept the Plan by providing to such creditors or interest holders on account of such Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation

38

Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the Plan provides for the continuation after the Effective Date of all retiree benefits provided by the Debtor, if any, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Debtor have been made.

## B.    VOTING PROCEDURES AND REQUIREMENTS

Pursuant to the Bankruptcy Code, only classes of Claims against or Equity Interests in the Debtors that are "Impaired" under the terms of the Plan are entitled to vote to accept or reject the Plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, classes of Claims or Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance.

C.    CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the Confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for _____ at _____.m., before Honorable Robert J. Faris, United States Bankruptcy Court for the District of Hawaii, 1132 Bishop Street, Suite 250L, Honolulu, Hawaii 96813.

**NOTE: The hearing will be held via telephonic conference:**
Toll-free number: (866) 390-1828
Access Code: 3287676

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest held by the objector.  Any such objections must be Filed and served upon the Persons designated in the Notice of the Confirmation Hearing, in the manner and by the deadline described therein.

D.    MODIFICATION OR WITHDRAWAL OF THE PLAN.

The Plan Proponents may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to

section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order. The Plan Proponents reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Plan Proponents determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After confirmation of the Plan, the Plan Proponents may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Plan. After confirmation of the Plan, the Plan Proponents may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

The Plan Proponents in the exercise of their sole and unfettered discretion, reserve the right to revoke and withdraw the Plan at any time prior to the Confirmation Date, in which case the Plan will be deemed to be null and void (including, without limitation, (1) any discharge of Claims and Administrative Expense Claims, pursuant to section 1141 of the Bankruptcy Code will be deemed null and void, (2) the assumptions, assumptions and assignments or rejections of executory contracts and unexpired leases pursuant to the Plan will be deemed null and void, and (3) nothing contained in the Plan will (a) constitute a waiver or release of any Right of Action, Claim or Administrative Expense Claim or (b) prejudice in any manner the rights of the Debtors or the Estates.

41

E.    ACCEPTANCE OR CRAMDOWN

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Equity Interests vote to accept the Plan, except under certain circumstances.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired creditors.  Classes 1 and 2 are Unimpaired and deemed to accept the Plan.  Classes 3, 4, 5, 6, 7, and 8 are permitted to vote to accept or reject the Plan.  Class 9 is deemed to reject the Plan.

To the extent that a Class of Impaired Claims votes to reject the Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such rejecting class.

Section 1129(a)(10) requires that if a plan impairs a class of creditors, one Impaired class must vote to accept the plan without counting the vote of an insider. The Plan Proponents submit that if any of Classes 3, 4, 5, 6, 7, or 8 votes to accept the Plan, the requirements of section 1129(1)(10) will be met.

F.    BEST INTERESTS TEST; LIQUIDATION ANALYSIS

Notwithstanding acceptance of the Plan by each Impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such Impaired Class who has not voted to accept the Plan.  Accordingly, if an Impaired Class does not

unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such Impaired Class a recovery on account of the member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class or Claims or Equity Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee ("Liquidation Value"). The Liquidation Value of the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of Unsecured Claims in Class 5 through 8 would be reduced by, among other things:

(i)        the Claims of secured creditors in excess of the value of their collateral. In addition, in a chapter 7 liquidation any secured claims could not be Impaired as such claims are treated under the Plan;

43

(ii)     the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 case;

(iii)    unpaid Administrative Expense Claims of the Chapter 11 Case; and

(iv)    Priority Claims and Priority Tax Claims.

The costs of liquidation in a chapter 7 case would include the compensation of a trustee, as well as of counsel and of other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 case and all unpaid Administrative Expense Claims incurred by the Debtors during the Chapter 11 Case that are allowed in the chapter 7 case.

Generally, a chapter 7 trustee does not operate a debtor's business; in such circumstances, the Debtors would cease operations. Such cessation of operations would adversely affect the price that the Debtors' estates could obtain for a sale of its assets, thus generating a substantially lower recovery for Holders of Allowed Class 5-8 General Unsecured Claims.

The liquidation itself would trigger certain Priority Claims and would likely accelerate the payment of Other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Other Priority Claims and Priority Tax Claims would be paid in full out of the net

liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims. The Debtors believes that the liquidation also would generate an increase in Unsecured Claims, such as rejection damage Claims.

Attached hereto as <u>Exhibit C</u> is the Debtors' Liquidation Analysis. As shown by the Liquidation Analysis, the Debtors believes that if the Debtors' assets were liquidated in Chapter 7, the unsecured creditors in Classes 5-8 would receive anywhere between 0 and 20% on account of their respective claims, primarily because an auction sale will not generate as much as a private sale subject to overbid. Under the Plan, creditors in Classes 5-7 should receive 80% of their Allowed Claim if the CDH Lawsuit is successful. Based on the Liquidation Analysis, the Debtors believes that Holders of Claims and Equity Interests will receive value, as of the Effective Date, equal to or greater under the Plan than such Holders would receive under a chapter 7 liquidation.

G.     FEASIBILITY

Because the Plan does not contemplate further liquidation of assets or payments from cash flow, the feasibility requirement set forth in section 1129(a)(11) is not applicable to the Plan.

H.    COMPLIANCE WITH APPLICABLE PROVISIONS OF THE
      BANKRUPTCY CODE

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply

with the applicable provisions of the Bankruptcy Code.  The Debtors have

considered each of these issues in the development of the Plan and believes that the

Plan complies with all provisions of the Bankruptcy Code.

I.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of

the Effective Date, the Bankruptcy Court shall retain jurisdiction over the

Reorganization Case and any of the proceedings related to the Reorganization Case

pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the

fullest extent permitted by the Bankruptcy Code and other applicable law,

including, without limitation, such jurisdiction as is necessary to ensure that the

purpose and intent of the Plan are carried out.

V.    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
      CONSUMMATION OF THE PLAN**

The following discussion summarizes certain federal income tax

consequences of the implementation of the Plan to the Debtors and certain Holders

of Claims.  The following summary does not address the federal income tax

consequences to (i) Holders whose Claims are entitled to reinstatement or payment

in full in Cash, or are otherwise unimpaired under the Plan (*e.g.*, Holders of

Administrative Expense Claims, Holders of Priority Tax Claims), or (ii) Holders

whose Claims or Equity Interests are or may be extinguished without a distribution in exchange therefor.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR

OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.    CONSEQUENCES TO THE DEBTOR

The Debtors file a consolidated tax return and have tens of millions of net operating losses ("NOLs"), which the Debtors understand would be available to shelter any forgiveness of debt income discussed below.

### 1.    Cancellation of Debt

The tax attribute reduction rules of Internal Revenue Code section 108 may have the effect of severely reducing or eliminating the NOLs of PLUSH's parent, Pacific Links International.  Due to legal and factual uncertainties and other matters including the potential occurrence of a previous ownership change under Internal Revenue Code section 382, the extent to which Pacific Links International's NOLs will be available to shelter income from federal income tax currently is unclear.  Creditors and other parties in interest are cautioned against assuming that such NOLs will be available to any extent for such purpose.

### 2.    Reduction of the Debtors' Indebtedness

As a result of the Plan's implementation, the amount of the Debtors' aggregate outstanding indebtedness will be reduced substantially.  (Any amount of potential discharged indebtedness for federal income tax purposes will be referred to herein as a "Debt Discharge Amount").  In general, the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must include the

Debt Discharge Amount in its gross income in the taxable year of discharge to the extent that the Debtor Discharge Amount exceeds any consideration given for such discharge. No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

If a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to a plan approved by the court, such discharge of indebtedness is specifically excluded from gross income.

The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded from income. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers and foreign tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income. As discussed above, the tax attribute reduction rules may eliminate all or a large portion of Pacific Link International's NOLs and other tax attributes.

B.    <u>CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS</u>

Each holder of a Claim will recognize gain or loss measured by the

difference between (i) any cash and the fair market value of any other property received by such holder and (ii) its adjusted tax basis in the Claim. This income, gain or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands. Holders of Claims in the form of accounts or notes receivable acquired in the ordinary course of a trade or business for the performance of services or for the sale of inventory will recognize ordinary income, gain or loss. In addition, if a holder of a Claim has taken an ordinary deduction for the worthlessness of the Claim under the Code in a prior taxable year, any income or gain realized will be taxed as ordinary income to the extent of the ordinary deduction claimed.

## C.    BANKRUPTCY CODE EXEMPTIONS FROM REGISTRATION REQUIREMENTS

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa and applicable state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such an affiliate, or principally in such exchange and partly for cash or property.

## VI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the voting deadline.

| Pacific Links US Holdings, Inc. | Hawaii MVCC LLC |
|---|---|
| By _WeiZhou_____<br>WEI ZHOU, Its President | By _WeiZhou_____<br>WEI ZHOU, Its Manager |
| Hawaii MGCW LLC | MDRE LLC |
| By_WeiZhou_____<br>WEI ZHOU, Its Manager | By _WeiZhou_____<br>WEI ZHOU, Its Manager |
| MDRE 2 LLC | MDRE 3 LLC |
| By_WeiZhou_____<br>WEI ZHOU, Its Manager | By _WeiZhou_____<br>WEI ZHOU, Its Manager |
| MDRE 4 LLC | MDRE 5 LLC |
| By_WeiZhou_____<br>WEI ZHOU, Its Manager | By _WeiZhou_____<br>WEI ZHOU, Its Manager |

51

Submitted by:


/s/ Chuck C. Choi
CHUCK C. CHOI
ALLISON A. ITO
Attorneys for Debtors
and Debtors-in-Possession

# EXHIBIT A

Joint Chapter 11 Plan
[To be inserted]

# EXHIBIT B

Organizational Chart

83586



# Pacific Links- North America
## 05/01/2018

Mr. Du

Pacific Links International Company

Pacific Links Service Company

Pacific Links US Holdings, Inc.

Pacific Links US Services, Inc.

Pacific Links Canada Services Inc.

Hawaii MVCC LLC

Hawaii MGCW LLC

MDRE LLC

MDRE 2 LLC

MDRE 3 LLC

MDRE 4 LLC

MDRE 5 LLC

Makaha Valley Golf Club

Makaha Golf Course West

Makaha Resort Development Land Assets

Cayman Islands Entities

Canadian Corporations

U.S. Corporations

Golf Courses

Makaha Resort Land Holdings for Real Estate Development

# EXHIBIT C

Liquidation Analysis
[To be submitted]

83586

U.S. Bankruptcy Court - Hawaii   #21-00094   Dkt # 203   Filed  06/25/21   Page 62 of 62